1  PSYCH-APPEAL, INC.
   Meiram Bendat (Cal. Bar No. 198884)
2  8560 West Sunset Boulevard, Suite 500
   West Hollywood, CA 90069
3  Tel: (310) 598-3690, x 101
   Fax: (888) 975-1957
4  mbendat@psych-appeal.com

5  ZUCKERMAN SPAEDER LLP
   Aitan Goelman (*pro hac vice* forthcoming)
6  Christopher R. MacColl (*pro hac vice* forthcoming)
   1800 M St., NW, Suite 1000
7  Washington, DC 20036
   Tel: (202) 778-1800
8  Fax: (202) 822-8106
   agoelman@zuckerman.com
9  cmaccoll@zuckerman.com

10 *Attorneys for Plaintiff*

11

12                      UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF CALIFORNIA
13                        SAN FRANCISCO DIVISION

14 ROGER BROWN, on behalf of his
   beneficiary daughter,
15                                          Case No. 3:20-cv-04129
            Plaintiff,
16
        v.
17
   UNITED BEHAVIORAL HEALTH and
18 UNITEDHEALTHCARE INSURANCE            **COMPLAINT**
   COMPANY,
19
            Defendants.
20

21

22

23

24

25

26

27

28

Plaintiff Roger Brown, a pseudonym,[1] complains as follows on behalf of his beneficiary daughter, based on the best of his knowledge, information, and belief, formed after an inquiry reasonable under the circumstances by himself and his undersigned counsel, against Defendants United Behavioral Health ("UBH") and UnitedHealthcare Insurance Company ("UHIC"):

## INTRODUCTION

1.      This case arises from Defendant UBH's wrongful decision to deny coverage for mental health services at a residential treatment center ("RTC") for Plaintiff's 18-year-old daughter, Jane Brown, a pseudonym, referred to herein as "J.B." (together with Plaintiff, "the Browns").

2.      J.B. suffers from severe mental health conditions, including treatment-resistant major depressive disorder (referred to as "refractory depression"), atypical anorexia nervosa, and generalized anxiety.   J.B. attempted suicide on four occasions, had several psychiatric hospitalizations, and engaged in self-harm beginning at age 13 and as recently as March 2020.

3.      In addition to the pain and anxiety J.B.'s parents have endured as a result of their daughter's illness, they were forced to pay tens of thousands of dollars of out-of-pocket healthcare expenses for medically necessary care that UBH refused to cover.  In the medical judgment of J.B.'s providers, this treatment was necessary and may, in fact, have saved her life.  Nevertheless, UBH denied these benefit claims, which as detailed further below, violated the terms of J.B.'s ERISA-governed health insurance plan and breached UBH's duties as a fiduciary of the plan.  UBH denied J.B. coverage through its grossly deficient and biased application of the American Association of Community Psychiatrists Level of Care Utilization System ("LOCUS").  In doing so, it elevated its own financial interest over the medical needs of J.B., its beneficiary.

4.      From November 1, 2019 to March 10, 2020, J.B. was treated at Monte Nido Vista, an eating-disorder-focused RTC located in Agoura Hills, California.  On March 10, 2020, J.B. was transferred from Monte Nido Vista to an inpatient mental health treatment unit at Aurora Vista Del

---

[1] Once Defendants are served with this Complaint and appear, Plaintiff will file an administrative motion to proceed under a pseudonym in accordance with Civil L.R. 7-11, which will be accompanied by "a stipulation under Civil L.R. 7-12 or . . . a declaration that explains why a stipulation could not be obtained."  Undersigned counsel anticipates, based on his experience with Defendants in similar cases, that Plaintiff will obtain Defendants' consent to proceed under a pseudonym.

Mar Hospital due to active suicidal ideation and self-harm. After leaving Monte Nido Vista, J.B.'s eating disorder quickly worsened, and after she lost nearly four pounds in seven days, J.B. was sent back to Monte Nido Vista.

5.      On March 17, 2020, then seventeen-year-old J.B. was re-admitted to Monte Nido Vista's RTC for treatment of her anorexia nervosa, with her severe, treatment-resistant major depressive disorder and generalized anxiety identified as comorbidities.

6.      Given the severity of her condition, her medical providers expected to transfer J.B. to an inpatient electroconvulsive therapy ("ECT") program after her quickly-approaching eighteenth birthday. Those plans were stymied by the COVID-19 pandemic, which rendered unavailable the inpatient therapy program that J.B.'s providers had been considering.

7.      J.B.'s providers at Monte Nido Vista discussed potential discharge options in late March and in early April 2020. They concluded, however, that a Partial Hospitalization Program ("PHP") would not provide an adequate level of care. The only available PHP was being conducted remotely due to the COVID-19 pandemic. The providers concluded that stepping J.B. down to a PHP would be inappropriate because, "due [to] risk to self, [J.B.] cannot be at home at this time." As a result, residential treatment remained the most appropriate level of care for J.B.

8.      J.B.'s providers recommended that she remain in residential treatment for several more weeks, during which, in lieu of ECT, she would receive ketamine treatments, which have been clinically shown to provide relief for many patients who, like J.B., suffer from medication-resistant depression. Nevertheless, UBH denied coverage for J.B.'s RTC treatment from April 6, 2020 forward.

9.      Fearing for their daughter's safety, Plaintiff and his wife agreed with J.B.'s providers' conclusion that suspending RTC treatment for J.B. at that time would threaten her wellbeing and her prospects for recovery. The Browns therefore paid tens of thousands of dollars out-of-pocket for J.B.'s continued treatment at the Monte Nido Vista RTC until April 28, 2020— treatment that J.B. needed and which UBH refused to cover.

10.     At all relevant times, UBH was the behavioral health benefits administrator for Plaintiff's fully-insured, employer-sponsored health plan, which was issued by UnitedHealthcare

Insurance Company.  The plan required UBH to make medical necessity determinations in a manner consistent with generally accepted standards of medical practice.  J.B.'s RTC treatment from April 6, 2020 forward was medically necessary and should have been approved under LOCUS, which UBH had adopted as its standard medical necessity criteria, and purported to apply in J.B.'s case.

11.     UBH denied J.B.'s claim for treatment from April 6, 2020 forward while paying lip service to, but otherwise ignoring, LOCUS.  As detailed further below, UBH's evaluation of J.B.'s condition contained obvious errors and was fundamentally biased.  That J.B.'s continued treatment at the RTC was medically necessary is plain from UBH's own records.

12.     UBH's conduct can only be fully understood by appreciating how reluctantly it adopted LOCUS.  UBH adopted LOCUS on December 19, 2019, after Chief Magistrate Judge Spero's post-trial decision earlier in the year in *Wit v. United Behavioral Health*, No. 14-cv-02346, 2019 WL 1033730 (N.D. Cal. Mar. 5, 2019).  There, Judge Spero found that UBH had breached its ERISA fiduciary duties by adopting its own, pervasively-flawed, Level of Care Guidelines for making medical necessity determinations under ERISA-governed plans, and that UBH abused its discretion when it used those guidelines to deny coverage to the *Wit* class members.  Judge Spero found that UBH's Level of Care Guidelines violated the *Wit* class members' plans because they were inconsistent with generally accepted standards of care.

13.     Judge Spero's detailed findings explained that the generally accepted standards of care in the behavioral health field include the following principles:

      a.     "[E]ffective treatment requires treatment of the individual's underlying condition and is not limited to alleviation of the individual's current symptoms;"

      b.     "[E]ffective treatment requires treatment of co-occurring behavioral health disorders and/or medical conditions in a coordinated manner that considers the interactions of the disorders and conditions and their implications for determining the appropriate level of care;"

c.     "[P]atients should receive treatment for mental health and substance use disorders at the least intensive and restrictive level of care that is safe and effective;"

d.     "[W]hen there is ambiguity as to the appropriate level of care, the practitioner should err on the side of caution by placing the patient in a higher level of care;"

e.     "[E]ffective treatment of mental health and substance use disorders includes services needed to maintain functioning or prevent deterioration;"

f.     "[T]he appropriate duration of treatment for behavioral health disorders is based on the individual needs of the patient; there is no specific limit on the duration of such treatment;" and

g.     "[T]he determination of the appropriate level of care for patients with mental health and/or substance use disorders should be made on the basis of a multidimensional assessment that takes into account a wide variety of information about the patient." *Id.* ¶¶ 71-81.

14.     Judge Spero found that the UBH Level of Care Guidelines in effect from 2011–2017 were "riddled with requirements that provided for narrower coverage than is consistent with generally accepted standards of care.  Among other failings, those guidelines placed outsized emphasis on "stabilizing crises while ignoring the effective treatment of members' underlying conditions." *Id.* ¶ 82.

15.     Particularly notable, given the factual underpinnings of Plaintiff's claims here, is that several iterations of UBH's guidelines included a troubling focus on acute symptoms, to the exclusion of consideration of the chronic, underlying, illnesses that cause most mental health problems.  This near-obsession on acuity was encapsulated in UBH's "why now" requirement.  "Why now" required patients to demonstrate that "acute changes" in their "signs and symptoms and/or psychosocial and environmental factors" necessitated the more restrictive (and expensive) level of care (e.g. residential treatment as opposed to PHP treatment). *Id.* ¶ 96.  As Judge Spero found, those requirements were "not consistent with generally accepted standards of care because

they are overly focused on treatment of acute symptoms," when "neither 'acute symptoms' nor 'acute changes' should be a mandatory prerequisite for coverage of outpatient, intensive outpatient or residential treatment." *Id.*

16.    Additionally, Judge Spero concluded that UBH's decisions to implement its defective standards were improperly motivated by UBH's financial self-interest.  In light of these defects in UBH's Level of Care Guidelines, Judge Spero determined that using those guidelines to determine whether services were consistent with generally accepted standards of medical practice was "unreasonable and an abuse of discretion because they were more restrictive than generally accepted standards of care." *Id.* ¶ 212.

17.    Following his decision on the merits in *Wit*, Judge Spero ordered briefing on the appropriate remedies for the class members; one remedy requested by the *Wit* Plaintiffs was an injunction mandating that UBH replace its own, self-serving Guidelines with third-party standards that undisputedly reflected the generally accepted standards of care.  While the *Wit* remedies requests were under advisement, in December 2019, UBH purported to replace its pervasively flawed Level of Care Guidelines with the very standards requested by the *Wit* plaintiffs.

18.    Insofar as it is relevant to this case, UBH adopted the Level of Care Utilization System for Psychiatric and Addiction Services Adult Version 20 ("LOCUS") as its standard criteria for making medical necessity determinations for adults with mental health conditions.  In practice, however, the changes were superficial, as UBH feigned application of LOCUS while continuing to adhere to the focus on acuity that had long characterized its approach to utilization management.

19.    UBH's denial of J.B.'s claim for her RTC treatment from April 6, 2020 forward is a prime example of UBH's continued overemphasis on acute symptoms, its disregard of comorbidities, and its failure to err on the side of safety and effectiveness—particularly when less intensive levels of care, such as PHP, cannot offer in-person monitoring.  The denial was based on UBH's belief that J.B. was not in *immediate* danger; according to UBH's denial, "the facility states that [J.B.] is not *currently* suicidal or homicidal."  (Emphasis added).  This focus on the absence of an immediate risk of danger ignores the fact that, as explicitly advised by J.B.'s providers, the likely

reason that J.B. was not in immediate danger was precisely because she was receiving residential treatment.

20.     Additionally, UBH recognized, but otherwise ignored, the treating provider's report that while J.B. had "refractory depressive symptoms with intermittent thoughts of suicide by hanging"—to a degree that required ECT to effectively treat—and that while she was "responsive" to treatment through intervention at the RTC, the provider was "concerned that the member would not receive the same degree of support at home."

21.     Moreover, UBH's denial ignored the fact that, even if J.B.'s providers were wrong and a PHP would provide adequate treatment, because of the COVID-19 pandemic, PHP's at the time were providing only remote, online care, rendering them far less safe and effective, particularly for eating disorders and comorbid depression with a history of suicidality, which by definition require consistent clinical monitoring and interventions.

22.     Essentially, UBH determined that because it appeared that J.B.'s residential treatment might be working, it was no longer necessary and had to be stopped.

23.     Even worse, as alleged below, UBH denied coverage to J.B., citing LOCUS, even though the only LOCUS analyses UBH undertook conclusively established that residential treatment was medically necessary for J.B.

24.     Despite purportedly adopting LOCUS, UBH either outright ignored it or applied the criteria in a manner that was biased, improper, and inconsistent with generally accepted standards of medical practice and UBH's fiduciary duties.  UBH's denial of J.B.'s claim for residential treatment from April 6, 2020 forward was wrongful and dangerous, and must be remedied.

**THE PARTIES**

25.     Plaintiff Roger Brown is a participant in an ERISA-governed health insurance plan that is sponsored by his employer (the "Brown Plan" or the "Plan").  Plaintiff's daughter, Jane Brown or "J.B.", is a beneficiary of the Plan.  The Browns reside in Orange County, California.

26.     Plaintiff is J.B.'s agent appointed pursuant to a power-of-attorney granting him the right to bring this suit on J.B.'s behalf.

27.    Defendant UnitedHealthcare Insurance Company ("UHIC"), a subsidiary of UnitedHealth Group ("UHG" and, together with UBH, "United") is the underwriter of and claims administrator for the Brown Plan.  UHIC is based in Hartford, Connecticut, and UHG is based in Minneapolis, Minnesota.  UHIC issued the Certificate of Coverage for the Brown Plan and is vested with the fiduciary responsibility to make all final and binding coverage determinations under the Plan.

28.    Defendant UHIC delegated responsibility for making all final and binding coverage determinations for mental health and substance use disorder benefits under the Brown Plan to its corporate affiliate, Defendant United Behavioral Health ("UBH").

29.    Defendant United Behavioral Health ("UBH"), which operates under the brand name Optum, is a corporation organized under California law, with its principal place of business in San Francisco, California. UBH bears the financial risk for mental health claims.

30.    Because of the role that UHIC plays in delegating its responsibility for final and binding coverage determinations and the role that UBH plays in making final and binding coverage determinations under the Brown Plan, both Defendants are functional fiduciaries under ERISA, 29 U.S.C. § 1104.  As ERISA fiduciaries, UHIC and UBH owe duties of loyalty to plan participants and beneficiaries, which require them to act "solely in the interests of the participants and beneficiaries" of the plans they administer and for the "exclusive purpose" of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plans.  29 U.S.C. § 1104(a)(1)(A).  UHIC and UBH also owe plan participants and beneficiaries duties of care, which require Defendants to act with reasonable "care, skill, prudence, and diligence" and in accordance with the terms of the plans, so long as such terms are consistent with ERISA.  *Id.* § 1104(a)(1)(B), (D).

**JURISDICTION AND VENUE**

31.    Defendant UBH's actions in administering employer-sponsored health care plans, including exercising discretion with respect to determinations of coverage for Plaintiff's daughter J.B. under the Brown Plan, are governed by ERISA, 29 U.S.C. §§ 1001–1461.  This Court has

1   subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and 29 U.S.C.

2   § 1132(e) (ERISA).

3       32.     Personal jurisdiction over Defendant UBH exists with this Court. UBH is a

4   corporation organized under California law with significant contacts in California.

5       33.     Venue is appropriate in this District. Defendant UBH is headquartered in this

6   District, administers plans here, and conducts significant operations here.

7                           **INTRADISTRICT ASSIGNMENT**

8       34.     This case should be assigned to the San Francisco Division of this Court because

9   Defendant UBH is headquartered in San Francisco, administers plans here, and conducts significant

10  operations here.

11                          **STATEMENT OF FACTS**

12  **I.    Plaintiff's Plan**

13      35.     The Brown Plan is a fully-insured plan issued by UHIC and governed by ERISA

14  and California State law.

15      36.     The Brown Plan covers treatment for sickness, injury, mental illness, and substance

16  use disorders.  Residential treatment is a covered benefit under the Plan.  The Plan does not limit

17  coverage for residential treatment to emergency, short-term or crisis stabilization services.

18      37.     As the behavioral health administrator for the Brown Plan, UBH interprets Plan

19  terms, limitations, and exclusions to make determinations of coverage for behavioral health

20  services, and to cause any resulting benefit payments to be made by the Plan.  Under the terms of

21  the Brown Plan, an essential condition of coverage is that covered services must be consistent with

22  generally accepted standards of medical practice.

23      38.     Therefore, one of the essential determinations UBH must make when reviewing

24  claims for coverage under the Plan is whether the services for which coverage is requested are

25  consistent with generally accepted standards of medical practice.  As described below, after Judge

26  Spero's decision in *Wit* in 2019, UBH purported to adopt LOCUS as its standard criteria for making

27  medical-necessity determinations—i.e., whether the services for which coverage is requested are

28

consistent with generally accepted standards of medical practice—but in J.B.'s case, UBH failed to apply LOCUS faithfully.

39.     UBH's failures to apply LOCUS faithfully are manifest.  For example, LOCUS (and the generally-accepted standards on which it is based) require UBH to err on the side of caution by approving coverage at higher levels of care when there is ambiguity or when recommended treatment at a lower level of care is not available.  In J.B.'s case, UBH did just the opposite, erring on the side of restricting care even though J.B.'s treating providers did not believe PHP (especially online-only PHP) would keep J.B. safe, let alone provide effective treatment for her.

40.     UBH also failed utterly to take into account the seriousness of J.B.'s co-occurring condition, which aggravated her clinical picture and complicated treatment.  Under LOCUS, J.B.'s co-morbid refractory major depression should have—on its own—provided a basis for residential treatment.  But UBH, shortly before denying J.B.'s claim, inexplicably altered *its own* prior evaluation of LOCUS Dimension III (co-morbidity), dropping its assessment of J.B.'s co-morbidities from 4 ("major") to 1 ("no co-occurring conditions").

41.     Even after UBH made the unsupported alteration to its scoring of J.B.'s co-occurring conditions, LOCUS should have dictated approval of J.B.'s residential treatment.  UBH, however, denied coverage—yet cited LOCUS in support of its wrongful determination.

42.     Because the Brown Plan was fully-insured by United—meaning that United paid UBH's benefits determinations—those determinations were prone to biases.  UBH and its corporate affiliates stood to benefit dollar-for-dollar for the claims they denied.  Upon information and belief, just as UBH was found to do in *Wit*, here UBH allowed its profit bias to infect its claims administration process and trump its duties to its insureds.

**II.     Generally Accepted Standards of Medical Practice**

43.     Generally accepted standards of medical practice, in the context of mental health disorder services, are the standards that have achieved widespread acceptance among behavioral health professionals.

44.     In the area of mental health disorder treatment, there is a continuum of intensity at which services are delivered, ranging from outpatient services, to higher levels of service intensity

1    like intensive outpatient programs, PHP, RTC, and inpatient hospitalization.  There are generally

2    accepted standards of medical practice for matching patients with the level of care that is most

3    appropriate and effective for treating patients' conditions.

4         45.    These generally accepted standards of medical practice are reflected in multiple

5    sources, including peer-reviewed studies in academic journals, guidelines and materials distributed

6    by government agencies, and consensus guidelines from professional organizations, including

7    LOCUS, described further below, which UBH adopted in December 2019 and purported to apply

8    to J.B.'s claims.

9         46.    Judge Spero also accurately set forth these generally accepted standards of medical

10   practice in the *Wit* Findings of Fact and Conclusions of Law.  *See* ¶ 13, *supra*.

11        47.    UBH, as claims administrator and ERISA fiduciary, owed the J.B., as a beneficiary

12   of the Brown Plan, a fiduciary duty to reasonably interpret the Plan, including when establishing

13   and applying the criteria by which UBH would determine whether services are consistent with

14   generally accepted standards of medical practice.  It was UBH's duty to use due care and act

15   prudently and solely in the interests of the Plan participants and beneficiaries when doing so.

**III.   Level of Care Utilization System for Psychiatric and Addiction Services Adult**
         **Version 20 ("LOCUS 20")**

18        48.    UBH exercised its discretion under the plans it administers by, among other things,

19   adopting and purporting to apply LOCUS as its standard medical-necessity criteria to determine

20   whether care for which coverage is requested is consistent with generally accepted standards of

21   medical practice.

22        49.    LOCUS is a level of care assessment tool that is widely used by behavioral health

23   managers and clinicians throughout the country to support accurate level of care recommendations.

24   LOCUS 20 is the current version of LOCUS and the version UBH purportedly applied to deny

25   J.B.'s claim.

26        50.    LOCUS 20 has six dimensions that are evaluated for purposes of determining the

27   appropriate level of care: (1) Risk of Harm; (2) Functional Status; (3) Medical, Addictive and

28   Psychiatric Co-Morbidity; (4) Recovery Environment; (5) Treatment and Recovery History; and

(6) Engagement and Recovery Status.  LOCUS provides criteria for assigning a given rating or score in each dimension, on a five-point scale.

51.     Each rating in the scale is defined by one or more criteria.  Only one of the criteria needs to be met for the associated dimension score to be assigned to the subject.  Higher numerical ratings are associated with more pressing need.  For example, a '5' on the Risk of Harm Dimension indicates an "Extreme Risk of Harm," which would be scored where a patient exhibited "current suicidal or homicidal *behavior*," while a '4' indicates a "Serious Risk of Harm," and might indicate "current suicidal or homicidal *ideation* with expressed intentions."  When there is ambiguity as to whether a patient meets one of the criteria for a given dimension rating, LOCUS 20 provides that the *highest* score in which it is more likely than not that at least one criterion has been met should be assigned.  LOCUS 20 thereby intends that any errors in rating should be made on the side of caution.

52.     Additionally, LOCUS 20 defines six "levels of care" in the service continuum: recovery maintenance and health management, low intensity community based services, high intensity community based services, medically monitored non-residential services, medically monitored residential services, and medically managed residential services.  These levels of care are defined in terms of four variables: care environment, clinical services, support services, and crisis resolution and prevention services.  Ultimately, however, LOCUS 20 dictates that the particulars of program development be left to providers to determine based on local circumstances and outcome evaluations.

53.     LOCUS 20 provides a decision tree that can then be used to obtain a placement recommendation, instructing that scores from the six dimensions are combined to provide a composite score while noting that a score of 4 in any of the first three dimensions independently warrants residential treatment.

54.     LOCUS 20 recognizes that there may be some circumstances in which the level of care recommended by the system will be unavailable.  In these circumstances, consistent with generally accepted standards of medical practice, LOCUS 20 instructs that the higher level of care must be selected, unless there is a clear and compelling rationale to do otherwise.

55.     As further explained below, at the time UBH denied her claim for coverage, an objective consideration of J.B.'s needs under LOCUS 20's decision tree would have led to the conclusion that J.B. required Level Five Medically Monitored Residential Services—i.e., the level of care she was receiving at Monte Nido Vista.

**IV.     J.B.'s Residential Treatment from April 6, 2020 Forward was Medically Necessary**

56.     On March 17, 2020, following inpatient mental health treatment during which she lost nearly 4 pounds over the course of one week, J.B. was re-admitted to Monte Nido Vista's RTC for treatment of her anorexia nervosa.  Her severe, treatment-resistant major depressive disorder and generalized anxiety were identified as comorbidities.

57.     Although residential treatment was clearly appropriate, UBH only approved coverage from her admission through April 6, 2020 in bite-sized nuggets—parsimoniously doling out authorizations for just one to five days at a time.  LOCUS 20, however, specifically instructs that "reviews should not be more often than every week for sub-acute intensive care settings such as . . . step-down facilities, and no more than every three months for extended care facilities."  This instruction is meant to ensure that patient status and progress are evaluated over a meaningful period of time—particularly at a sub-acute level of care intended "for persons who are suffering from long term and persistent disabilities that require extended rehabilitation and skill building in order to develop capacity for community living."

58.     As of April 1, 2020, UBH's records provided the following summary of J.B.'s scoring under LOCUS 20:

Guideline Used: LOCUS
LOCUS Score (24) - Level Five - Medically Monitored Residential Services (RTC) or clinical discretion (describe)
Dim 1 (4) Risk of Harm
Dim 2 (4) Functional Status
Dim 3 (4) Co-Morbidity
Dim 4A (3) Level of Stress
Dim 4B (3) Level of Support
Dim 5 (4) Treatment and Recovery History
Dim 6 (2) Engagement
Based on the clinical provided, [J.B.] meets the criteria per the Level of Care Utilization System
(LOCUS) for EDO RTC, Level of Care 5.

59.     On April 3, 2020, despite J.B.'s inability to obtain ECT, UBH inexplicably modified J.B.'s LOCUS 20 Co-Morbidity Dimension from a '4' – Major Co-Morbidity to a '1' – No Co-Morbidity, thereby completely discounting J.B.'s serious, treatment complicating co-morbidities of refractory depression and anxiety.

60.     This modified scoring is particularly remarkable given that Candace Sebastian, the UBH claims adjuster evaluating J.B.'s case, changed the Co-Morbidity score to a '1' on April 3, only two days after she had correctly assigned a Co-Morbidity score of '4', and in the absence of any evidence of changed circumstances in those two days.

61.     Even with the comorbidity score erroneously listed as '1', UBH's internal scoring reflected that residential treatment was warranted based on a '4' rating in each of the first two Dimensions: 1 (Risk of Harm) and 2 (Functional Status).

62.     Under LOCUS 20, a score of '4' in any of the first three Dimensions independently warrants residential treatment.  The only exception to an automatic RTC recommendation with respect to a score of '4' in Dimensions 2 or 3 (but not 1) is if the patient's recovery environment (home) is both "low-stress" and "highly supportive."  In J.B.'s case, Ms. Sebastian noted that the recovery environment was both "moderately stressful" and of "limited support."  J.B.'s residential treatment should therefore have been approved because she remained a '4' in the first two Dimensions (Risk of Harm and Functional Status).

63.     No UBH employee rescored J.B. under LOCUS 20 after the April 3 scoring by Ms. Sebastian, who recognized that residential treatment remained appropriate even under the errant scoring in Dimension 4, which is why she approved treatment through April 6.

64.     In short, during the first week of April 2020, J.B. had an obvious need for residential treatment, which UBH's own records recognize.

**V.     UBH Improperly Denied J.B.'s Claim for RTC Treatment**

65.     Although Ms. Sebastian correctly approved J.B. for continued RTC on April 3, 2020, a mere three days later, in the absence of any new scoring and despite explicitly noting that there had been "no changes reported since [April 3, 2020]," Ms. Sebastian referred J.B.'s claim for peer review.  (At UBH, only a Peer Reviewer can issue a clinical denial, and a "Care Advocate"

1    like Ms. Sebastian should only refer a case for peer review when it appears that UBH's clinical

2    criteria are not satisfied).

3        66.    In making her referral, Ms. Sebastian focused solely on the amount of time J.B. had

4    received RTC and not on her actual functioning or progress, writing that the "[c]ase is being sent

5    for Peer to Peer to determine medical necessity for the Eating Disorder Residential (EDO RTC)

6    LOC, per Level of Care Guidelines: as of 4/06/20, [J.B.] will be in the EDO RTC program 21 days

7    (2 separate authorizations)."

8        67.    That same day, a UBH medical director, Dr. Odom, conducted a peer review – but

9    did not undertake a new LOCUS 20 analysis.  Dr. Odom nevertheless denied J.B.'s claim for further

10    treatment at Monte Nido Vista, noting that J.B.'s treating physician had reported that "the member's

11    [eating disorder] symptoms are stable, but *she's got refractory depressive symptoms with*

12    *intermittent thoughts of suicide by hanging*," adding that while J.B. was "responsive" to treatment

13    through intervention at the RTC, the treating physician was "concerned that the member would not

14    receive the same degree of support at home."  (Emphasis added).  Dr. Odom also noted that J.B.

15    had been referred to receive electroconvulsive therapy treatment for her depression, "but this

16    service is not available at this time due to COVID-19."

17        68.    Dr. Odom's review was so haphazard that she attempted to retroactively deny

18    coverage from April 2 forward, even though UBH's case manager had already approved residential

19    treatment until April 6.  UBH later revisited the dating error in an April 10, 2020 "corrected letter"

20    to J.B.

21        69.    J.B.'s treating physicians sought an urgent appeal review of the denial, and in

22    response, on April 7, 2020, Dr. Odom wrote an addendum to her April 6, 2020 denial.  The

23    addendum stated, J.B.'s "symptoms of EDO have stabilized.  This is the primary reason for the

24    current episode of care.  Her depressive symptoms and her personal functioning are better than they

25    were when she entered residential care.  Currently, there's no serious risk of violence and no serious

26    functional impairment that requires around-the-clock monitoring and care."   Dr. Odom's

27    addendum, like her initial peer review note, contained no LOCUS 20 scoring, placed outsized

28

emphasis that it placed on J.B.'s *current* condition, and failed to consider J.B.'s broader clinical needs and the probable consequences of reducing her level of care.

70.     Later on April 7, 2020, another UBH medical director, Dr. Solomon, evaluated J.B.'s claim on urgent appeal.

71.     The "Contact Summary" associated with the urgent appeal includes a note stating: "Inbound call from Mother . . . . Parents afraid she will harm herself if taken home."

72.     J.B.'s condition on or about April 7, 2020 is reflected by the following paragraphs from Dr. Solomon's summary, which shows that Plaintiff's fears were reasonable and that UBH's reviewer categorically disregarded LOCUS 20 by, among other things, improperly focusing on the absence of an immediate risk of harm, which was a product of the residential treatment J.B. was receiving (and in any event, a criterion applicable to psychiatric hospitalization and not RTC), rather than on explicit LOCUS 20 criteria supporting continued residential treatment such as (1) the existence of suicidal *ideation* with a past history of carrying out such behaviors; (2) serious disturbances in physical functioning (i.e., self-feeding); and (3) unresolved, treatment undermining co-morbidities:

> Risk of harm: readmitted . . . a few weeks ago due to [suicidal ideation ("SI")] [History ("Hx")] of active SI with hx of attempts. *Has current SI with plan.* Today she has higher motivation to live. *Unable to feed herself without support staff. Urges to purge.* If I leave I'll just go back to my eating disorder. She is engaging with peers and checking in with staff, but has depression that leads to anxiety and is *unable to use her coping skills. She has a treatment resistant [major depressive disorder ("MDD")].* The considering partial [i.e., a "partial hospitalization program" ("PHP") that involves several hours a day of treatment, but no overnight services], which is virtual at this point. But isn't the best for meal completion. They are concerned of her living with siblings. They are increasing family therapy. She has low level of distress tolerance and has difficulty with emotional regulation. She is reaching out more and building on her coping. . . . She is feeling that the medications are beginning to work. She is not suicidal now, but they are concerned that this will happen in the future. . . .

(Emphasis added.)

73.     Incredibly, despite the clinical information he had been provided, Dr. Solomon entered the following denial rationale:

Adverse Benefit Determination effective April 7, 2020.  Rationale: Taking into consideration the available information, along with the additional clinical information given by Choose an item. [*sic*] during the Peer Review, and also the locally available clinical services, it is my determination that the requested service does not meet [medical necessity standards under] the member's behavioral health plan benefits.  Specifically: The facility states that the member is not currently suicidal or homicidal.  Her behaviors are good.  She is participating in the program.  Her eating disorder symptoms are under control. She is not self harming and she does not have suicidal ideation at this time.

74.     On April 8, 2020, Dr. Solomon sent J.B. a letter informing her that, based on his April 7, 2020 urgent appeal/grievance review, he was upholding the denial of her claim for residential treatment benefits from April 2, 2020 forward.  Once again, the April 2 date used was a haphazard error, reflecting the pervasive carelessness and lack of diligence that plagued UBH's processes.  The full rationale provided was as follows:

We have denied the medical services/items listed below requested by you or your provider: Mental Health Residential Treatment as of April 7, 2020.  You are being treated for eating disorder depression and anxiety.  Your request was reviewed.  We have denied the medical services requested because we talked to your provider.

The criteria were not met because: you have improved.
• You are not sucidlal [*sic*] or a danger to yourself at this time.
• You have made good progress with your eating disorder.
• You do not need 24/7 supervision at this time.

75.     UBH's decision to conduct a peer review after the initial decision to grant coverage for the care recommended by J.B.'s physicians was based on the amount of time J.B. spent in treatment – not any change in J.B.'s medical condition – and its denial following peer review and the urgent appeal was based on precisely the sort of acuity-focused rationale that was flatly rejected by *Wit* and is inconsistent with generally accepted standards of care as reflected in LOCUS 20.

76.     As a result of the UBH medical directors' conclusions, which exhausted J.B.'s internal appeal rights under the plan, UBH recommended that J.B. attend an *online* PHP program, while trying to self-control her eating and her depression.

77.     Ordinarily, PHP treatment would involve significant in-person treatment at a physical facility.  But at the time of UBH's decision, only remote, online treatment was available to J.B. because of the COVID-19 pandemic.  Because the online program did not provide in-person

treatment, it equated to a significantly less intensive level of care than PHP is ordinarily intended to provide.

78.     LOCUS 20 foresaw that, in some circumstances, one or more levels of care would be unavailable to patients who exhibit the corresponding medical need.  When LOCUS 20 recommends a level of care that is unavailable, the level of care a patient receives must necessarily deviate from the recommended level either up or down on the continuum.  LOCUS 20 mandates that the "higher level of care must be selected, unless there is a clear and compelling rationale to do otherwise."

79.     Yet UBH failed to properly consider that PHP was functionally unavailable at the time it denied J.B.'s claim for RTC treatment.  Thus, even if UBH's denial would have been justified during normal times (which it was not), UBH was required to approve J.B.'s continued RTC treatment because no adequate PHP was available, and no clear and compelling rationale to provide J.B. with less than RTC treatment existed.

**VI.     The Denial Caused Damages**

80.     J.B. and her parents would prefer that J.B. live at home rather than stay in a residential mental health center.  This obvious truth is even more salient during a pandemic.  However, after lengthy discussions with J.B.'s doctors, J.B. and her parents agreed that J.B. would be in danger if she was discharged when UBH denied the treatment recommended by her doctors.

81.     Understanding that danger, the Browns paid out-of-pocket for J.B. to continue receiving treatment at the Monte Nido Vista RTC until April 28, 2020, at a cost of approximately $25,000.  During this period of time, J.B. received ketamine treatments, which are approved for medication-resistant depression.  While ketamine treatments are consistent with the standard of care, UBH has not paid for J.B.'s ketamine treatments.  The Browns therefore also paid out-of-pocket for J.B.'s ketamine treatments, at an additional cost of $3,000.

82.     J.B. and her doctors believe that the treatment that she received from April 6 through April 28, 2020, including the ketamine treatments, was at least partially successful.

**VII.    UBH Improperly Refused to Approve J.B.'s Claim for PHP Treatment**

83.    Since her discharge, J.B. has been receiving treatment through an online "PHP" offered by Monte Nido from Plaintiff's home.

84.    Although UBH approved J.B.'s claims for the online PHP treatment at first, UBH's claims adjuster refused to approve J.B.'s claim for PHP treatment from June 16, 2020 forward.

85.    As of the date of filing, PHP remains the appropriate level of care for J.B., and her physicians and therapists have recommended that she continue with that level of care.  On June 17, 2020, after UBH refused to approve J.B.'s claim for PHP, J.B.'s PHP provider sent the Browns a financial liability waiver.  The waiver asks the Browns to accept liability for $633 per day for J.B.'s continued care, if UBH ultimately denies coverage, as it appears poised to.  Notwithstanding the significance of this expense, the Browns agreed to pay out-of-pocket for J.B. to continue her medically necessary PHP treatment for as long as they can afford to do so.

86.    The Browns requested an urgent review, and UBH's claims adjustor referred the claim for peer-to-peer review but claimed that UBH could not conduct that review until June 22, 2020.  Despite being unable to complete a peer-to-peer review within ERISA's 72-hour timeframe for urgent care claims, *see* 29 C.F.R. § 2560.503-1, the claims adjuster declined to authorize further PHP.

87.    On June 22, 2020, a UBH medical director conducted a peer-to-peer review and denied J.B.'s claim for PHP treatment prospectively.  UBH did reverse course in part by agreeing to cover J.B.'s PHP treatment through June 22, 2020.  The Browns are seeking an urgent appeal.

88.    Because PHP remains the appropriate level of care for J.B., in addition to the approximately $28,000 in out-of-pocket expenses the Browns have paid for medically necessary services that have already been provided, the Browns are facing the certainty of additional harm.  UBH is forcing them to choose between (a) J.B. forgoing medically necessary care, and (b) the Browns accepting liability for care that UBH is wrongfully refusing to cover.

89.    J.B. has a reasonable expectation of additional future injuries as well, given that she remains a beneficiary of the Brown Plan and will need future treatments for her illnesses.  The facts to date give every indication that, absent judicial supervision or robust equitable relief, UBH will

continue to place its financial self-interest above its fiduciary duty to its insureds and to apply LOCUS 20 in a manner that is inconsistent with the generally accepted standards of medical practice.

### VIII.   UBH Violated ERISA and the Plan's Terms

90.     In light of its central role in administering claims for coverage of mental health and substance abuse disorder treatment, UBH is an ERISA fiduciary as defined by 29 U.S.C. § 1104(a). As such, UBH owes a duty of loyalty to Plan participants and beneficiaries which requires it to discharge its duties "solely in the interests of the participants and beneficiaries" and for the "exclusive purpose" of providing benefits to participants and beneficiaries and paying reasonable expenses of administering the plan.  UBH also owes plan participants and beneficiaries a duty of care, which requires it to act with reasonable "care, skill, prudence, and diligence" and in accordance with the terms of the plans, so long as such terms are consistent with ERISA.  UBH violated its duties to J.B. by overly focusing on acuity in denying J.B.'s claim for residential mental health coverage from April 6, 2020 forward; by recommending continued treatment at an illusory level of care that was not actually available; by denying coverage for J.B.'s PHP from June 22, 2020 forward after failing to timely conduct a peer-to-peer review; and by otherwise placing its own interests above those of J.B, failing to use due care, and failing to comply with the terms of the Brown Plan.

**COUNT I**
**Claim for Benefits Due (Against Both Defendants)**

91.     Plaintiff incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

92.     Plaintiff brings this Count on behalf of his daughter, J.B., pursuant to 29 U.S.C. § 1132(a)(1)(B).

93.     UHIC is the underwriter of Plaintiff's Plan and is the entity ultimately responsible for paying benefits due under the Plan.

94.     UHIC delegated to UBH its responsibility under Plaintiff's Plan to make coverage determinations with respect to mental health services.

95.     UBH wrongfully denied J.B.'s requests for coverage of her residential treatment at Monte Nido Vista RTC from April 6, 2020 forward.  This improper denial resulted, at least in part, from UBH's failure to properly apply LOCUS 20, which UBH ostensibly adopted and which, if properly applied, would have resulted in approval of J.B.'s request for coverage.

96.     Even assuming, contrary to UBH's own records, that J.B. did not need further residential treatment, UBH's denial violated the Brown Plan terms, because the denial presumed the availability of a lower level of care (PHP) that was known to be non-existent within Plaintiff's community at the relevant time.

97.     J.B. exhausted her rights to appeal UBH's denial of her claim for benefits associated with her RTC treatment and is entitled to *de novo* judicial review of that denial pursuant to Cal. Ins. Code § 10110.6.

98.     UBH has also failed to approve J.B.'s request for coverage of her PHP treatment from June 22, 2020 forward.  This improper refusal also resulted, at least in part, from UBH's failure to properly apply LOCUS 20, which UBH ostensibly adopted and which, if properly applied, would have resulted in approval of J.B.'s request for coverage.

99.     UBH refused to timely process J.B.'s urgent June 16, 2020 continued care request for PHP.  UBH's failure to conduct such a review within 72 hours has therefore exhausted J.B.'s administrative remedies, and J.B. is entitled to *de novo* judicial review pursuant to Cal. Ins. Code § 10110.6.

100.     UBH's wrongful denials of J.B.'s claims for coverage, and UHIC's resulting failure to pay benefits due to J.B., violated the terms of the Brown Plan.  The improper denials also endangered J.B.'s health and welfare and subjected J.B. and her family to substantial, unreimbursed out-of-pocket expenses.

101.     To remedy the improper denials of coverage alleged in this count, Plaintiff seeks an award of the benefits due to J.B. under her Plan for the services J.B. received, plus pre- and post-judgment interest.

**COUNT II**
**Claim to Clarify Right to Future Benefits (Against Both Defendants)**

102.    Plaintiff incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

103.    Plaintiff brings this Count on behalf of his daughter, J.B., pursuant to 29 U.S.C. § 1132(a)(1)(B), to clarify her rights to future benefits under the terms of the Brown Plan.

104.    As ERISA fiduciaries, pursuant to 29 U.S.C. §§ 1104(a) and 1105, UHIC and UBH are required to carry out their duties solely in the interests of the participants and beneficiaries of the Plan, to exercise reasonable prudence and due care, and to comply with the terms of the Plan. UHIC also has a duty to monitor UBH, to ensure that UBH complies with its own fiduciary duties, and to make reasonable efforts to remedy breaches by UBH.

105.    The Brown Plan requires UBH to determine whether services for which coverage is requested are consistent with generally accepted standards of medical practice.  The generally accepted standards of medical practice are widely available and well-known to UBH, and UBH has represented that it has adopted LOCUS 20, which is consistent with the generally accepted standards, as its standard medical necessity criteria.  Nevertheless, UBH violated its duties by applying LOCUS 20 in a manner that is inconsistent with those guidelines and the generally accepted standards of medical practice.

106.    UBH's breaches of its fiduciary duties have been, and will continue to be, the result of biases that pervade its benefit claims administration processes and by its failure to develop adequate claims administration processes.  UBH has elevated its own interests and those of its corporate affiliates above the interests of plan participants and beneficiaries.  By applying LOCUS 20 in a biased and obviously incorrect manner, UBH is dramatically narrowing the scope of coverage available under the Brown Plan and artificially decreasing the value of covered claims, thereby benefiting UHIC and itself.

107.    UHIC violated its fiduciary duties by enabling, encouraging, and failing to remedy UBH's breaches of fiduciary duty.

108.    J.B. has been, and will be, harmed by UBH's breaches of fiduciary duty because J.B.'s requests for coverage of benefits have been, and will be, evaluated according to a standard that conflicts with the terms of the Plan and LOCUS 20, which UBH purports to apply.

109.    Plaintiff seeks to clarify J.B.'s rights to future benefits under the terms of the plan through declaratory, injunctive, and/or other equitable relief to prevent UBH and UHIC from continuing to breach their fiduciary duties as alleged above.

## COUNT III
### Claim for Injunctive Relief (Against Both Defendants)

110.    Plaintiff incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

111.    Plaintiff brings this Count on behalf of his daughter, J.B., pursuant to 29 U.S.C. § 1132(a)(3)(A), to enjoin Defendants' acts and practices that violate ERISA, as detailed above. Plaintiff brings this claim only to the extent that the Court finds that the injunctive relief sought is unavailable pursuant to 29 U.S.C. § 1132(a)(1)(B).

112.    Plaintiff has been harmed, and is likely to be harmed in the future, by UBH's and UHIC's ERISA violations described above.

113.    In order to remedy these harms and prevent future harm, Plaintiff is entitled to enjoin these acts and practices pursuant to 29 U.S.C. § 1132(a)(3)(A).

## COUNT IV
### Claim for Appropriate Equitable Relief (Against Both Defendants)

114.    Plaintiff incorporates by reference all preceding paragraphs as though each were fully stated here.

115.    Plaintiff brings this Count on behalf of his daughter, J.B., pursuant to 29 U.S.C. § 1132(a)(3)(B), to obtain appropriate equitable relief to redress Defendants' breaches of fiduciary duty and ERISA violations, as detailed above. Plaintiff brings this claim only to the extent that the Court finds that the relief available pursuant to 29 U.S.C. § 1132(a)(1)(B) is inadequate to fully remedy the violations alleged above.

116.    Plaintiff has been harmed, and is likely to be harmed in the future, by Defendants' breaches of fiduciary duty and ERISA violations described above.

117.    Additionally, by engaging in this misconduct, Defendants unjustly enriched themselves insofar as they did not pay benefit claims that they were required to pay under the relevant Plan terms.

118.    In order to remedy these harms, Plaintiff is entitled to appropriate equitable relief pursuant to 29 U.S.C. § 1132(a)(3)(B).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in his favor against Defendants as follows:

A.    Awarding benefits due under the Plan for the services J.B. received;

B.    Awarding appropriate equitable relief, including but not necessarily limited to an appropriate monetary award based on disgorgement, restitution, surcharge or other basis, and additional declaratory and injunctive relief;

C.    Awarding Plaintiff disbursements and expenses of this action, including reasonable attorneys' and expert fees, in amounts to be determined by the Court, pursuant to 29 U.S.C. § 1132(g); and

D.    Granting such other and further relief as is just and proper in light of the evidence.

Dated: June 22, 2020

/s/ Meiram Bendat
Meiram Bendat (Cal. Bar No. 198884)
PSYCH-APPEAL, INC.
8560 West Sunset Boulevard, Suite 500
West Hollywood, CA 90069
Tel: (310) 598-3690 Ext: 101
Fax: (888) 975-1957
mbendat@psych-appeal.com

Aitan Goelman (*pro hac vice* forthcoming)
Christopher R. MacColl (*pro hac vice* forthcoming)
ZUCKERMAN SPAEDER LLP
1800 M St., NW, Suite 1000
Washington, DC 20036
Tel: (202) 778-1800
Fax: (202) 822-8106
agoelman@zuckerman.com
cmaccoll@zuckerman.com

*Attorneys for Plaintiff*

COMPLAINT
CASE NO. 3:20-CV-04129